## Power of Attorney

KNOW ALL MEN BY THESE PRESENTS, that KISCO, a corporation duly incorporated and existing under the laws of the Republic of Korea, having its place of business at 1044 Miam-ri, Jeungpyeong-eup, Jeungpyeong-gun, Chungcheongbuk-do 368-906, Korea, does hereby make, constitute and appoint Director Young-Gie (Joseph) Lee of the sales offices of GETWATT, KISCO Energy Division located at 12th Fl. Dabo B/D, Mapo-gu, Mapo-dong, Seould, Korea, acting jointly or severally, as its true and lawful Attorney-in-fact with full power and author to do, act and perform in its name and on its behalf the following:

1. Contract for OEM business with BOSCH SOLAR ENERGY Corp.

IN WITNESS WHEREOF, the shareholder has caused its company name to be subscribed hereto by its duly authorized representative on this 23rd day of December 2011.

KISCO

*[signature: Chang Sehong]*

Se-Hong Chang
CEO

Seal

## Contract for the Manufacture of Solar Modules (OEM)

between

**Bosch Solar Energy Corporation**
2988 Campus Dr. Suite 100
San Mateo
CA 94403
U.S.A.

- hereinafter referred to as the "CUSTOMER" -

and

**GETWATT, KISCO Energy Division**
1044 Miam-ri
Jeungpyeong-eup
Jeungpyeong-gun
Chungcheongbuk-do 368-906
Korea

- hereinafter referred to as the "SUPPLIER" -

### 1. Subject of the Contract

1.1   The parties hereby agree to the following terms providing for a contract for the manufacture and delivery of solar modules (hereinafter referred to as the "Contractual Product"). The CUSTOMER shall provide solar cells (hereinafter referred to as "Pre-Product") for the manufacture of these Contractual Products.

1.2   Manufacture and delivery of the Contractual Products shall be subject to the Terms and Conditions of Purchase of the CUSTOMER (Appendix 1) unless otherwise stipulated in this Delivery Contract. In case any provisions of the Terms and Conditions of Purchase of the CUSTOMER (Appendix 1) or any other Appendices conflict with this Delivery Contract, the terms of this Delivery Contract shall prevail. The general terms and conditions of the SUPPLIER shall not apply.

### 2. Duration of Contract

This contract shall become effective on 15.09.2011 and end on 31.12.2011, provided, that the term of this contract shall automatically be extended for additional one (1) year periods unless either party advises the other in writing not less that thirty (30) days prior to the expiration of the then-current term that the term shall not be extended.

### 3. Specifications

3.1   The Pre-Product to be provided by the CUSTOMER is specified in Appendix 2.

3.2   The Contractual Product shall be manufactured in accordance with the specification in Appendix 3 and supplied to the CUSTOMER.

3.3   The classification of the Contractual Products is also set forth in the specification in Appendix 3. The CUSTOMER shall only be supplied with Contractual Products of classes A and B, and the A-modules shall not be less than 99.5 % of the total annual quantity delivered.

3.4   The parties acknowledge that breakage of the Pre-Products (hereinafter referred to as "Production Breakage") may occur in the manufacturing process. The CUSTOMER and the SUPPLIER undertake to utilize their best technical efforts to minimize the level of Production Breakage to a minimum. The Parties agree that the CUSTOMER shall bear the costs associated with up to 2 % of the Production Breakage per month for each cell class. The costs associated with Production Breakage exceeding 2 % shall be borne by the SUPPLIER.

The SUPPLIER shall inform the CUSTOMER periodically (quarterly) with respect to the amount of the Production Breakage as set forth in Appendix 4 (Logistic Regulations). The CUSTOMER shall be informed immediately if the amount of Production Breakage per delivery exceeds 2 %.

3.5   The parties also acknowledge that embedding losses, which are stated in the solar simulator (hereinafter referred to as the "Flasher") data for each Contractual Product, may occur in the production process. The SUPPLIER undertakes to utilize its best technical efforts to keep minimize embedding losses.

The parties agree to maximum embedding losses of 6%.

An agreed measurement tolerance of ±3 % shall apply to each of the module power classes.

In the event the embedding losses exceed the agreed upon level, all costs resulting therefore shall be borne by the SUPPLIER, unless the cause of such excessive embedding losses is verified to have been CUSTOMER's Pre-Product.

3.6   The delivery obligations of the SUPPLIER shall include comprehensive documentation of the Contractual Product, in particular the Flasher data. The Flasher data shall be made available to the CUSTOMER prior to the agreed binding delivery date, at the latest on shipment of the goods, by way of online access or email notification. Furthermore, the SUPPLIER is obliged to take permanent inventory according to Appendix 4 (Logistic Regulations).

## 4. Quantities, ordering and delivery request schedule

4.1   The anticipated contractual volume is approx. 4 MW. In the case of 245 Wp modules, which would equate to a quantity of 16,327. The annual forecast will be transmitted automatically by the CUSTOMER in the form of weekly call-offs. This annual forecast is only an estimate of the requirements and is not binding. Depending on the market development, considerable deviations from these quantities are possible both up and down. When respective call-offs are submitted by the CUSTOMER, SUPPLIER is, however, obliged to supply to the CUSTOMER at least 130% of the anticipated total quantity set forth above.

4.2   The delivery of the Pre-Products and the call-off of the Contractual Products respectively required in each case shall be submitted via order and call-off plans. The

delivery schedule for the Pre-Products and the order and call-off plans for the Contractual Products shall be deemed accepted by the SUPPLIER if the SUPPLIER does not object to them in writing within 5 (five) working days after receipt. For the purposes of this Delivery Contract, "working day" shall mean any day that is not a public holiday in both USA and the Republic of Korea. Objections by the SUPPLIER shall only be accepted in case (a) the legally binding order exceeds or falls short of the CUSTOMER's previous non-binding preview for the 2nd and 3rd following month by more than 30 % or (b) the delivery schedule for the Pre-Products is not in conformity with the quantities of the Contractual Products stated in CUSTOMER's legally binding order.

Deliveries may only be made pursuant to binding orders as stated in the order or call-off plan. The delivery schedule for the Pre-Products and the order or call-off plans of the Contractual Products are generally renewed on a weekly rolling basis. Within the binding period changes to power classes but not to quantities are allowed. The binding order and non-binding forecast periods are defined in <u>Appendix 4</u> (Logistic regulations).

### 5. Prices

Price in US$ per Contractual Product:

<u>A module:</u>
The prices agreed for the 4th quarter 2011 are as follows:

  84.3 US$/module FCA Busan port, South Korea
  94.8 US$/module DAP Raleigh, North Carolina, USA
  90.6 US$/module DAP Fontana, CA, USA

<u>B module:</u>
Pricing as for A module minus 10 % for B quality.
The A module price shall be payable for B quality modules with the prior mutual consent by the CUSTOMER as set forth in section 11.3.

For all Contractual Products, the prices are deemed to be fixed prices for the 4th quarter of 2011. Upon the request by the CUSTOMER, the parties shall negotiate the price for the following quarter in due time prior to the commencement of the next quarter. This price will then apply for the quarter for which it has been negotiated. If neither the CUSTOMER nor the SUPPLIER requests for re-negotiation of the price, the price for the previous quarter will continue to apply. If no agreement is reached on the price, both the CUSTOMER and the SUPPLIER shall be entitled to terminate the contract with a period of notice of 3 months. The price for the preceding quarter shall then apply for the remaining duration of the contract.

### 6. Competitiveness

6.1 It is mutually agreed that both parties will take all the necessary actions to maintain the competitiveness of the Contractual Products and their manufacture.

6.2 With respect to technology, quality, price and delivery, the Contractual Products must be at least equivalent to comparable products of competitors. Such a comparable product must meet the requirements of the CUSTOMER.

6.3 In the event that a comparable product is offered by third parties at a more economic price, the CUSTOMER shall inform the SUPPLIER thereof in writing and

       provide the SUPPLIER with a reasonable period of time within which the SUPPLIER shall restore competitiveness with the third-party product offering, taking into account as best is possible the scope of the measures which will be required in order to do so; provided, however, this section 6.3 shall not affect the price of the Contractual Product during the period it has been fixed in accordance with section 5.

6.4    Upon receiving a notice from CUSTOMER pursuant to section 6.3 above, the SUPPLIER shall draft a plan of action to restore competitiveness without delay and shall present such plan to the CUSTOMER. This plan of action should also itemize the cost e ffectiveness of each individual action. Upon receipt of such plan for SUPPLIER, the CUSTOMER agrees to examine the plan, and if applicable, to point out any possible improvements to the SUPPLIER and to support the SUPPLIER in its implementation. Any trials and releases which may be required are to be conducted by the CUSTOMER quickly or to be applied for at its customers quickly.

6.5    The punctual presentation of an effective plan to restore competitiveness and its punctual implementation constitute material contractual obligations; provided, however, any changes to the prices shall be subject to section 5.

## 7. Terms of Payment

The CUSTOMER shall be obliged to make payment 30 days after receipt of the invoice.
The before mentioned 30 days start when the contractual products have arrived at the contracted destination.

## 8. Logistic Concepts

The logistic regulations set out in <u>Appendix 4</u> shall apply.

## 9. Terms of Delivery

9.1    The Pre-Products shall be delivered DAP see SUPPLIER address, page 1 (Incoterms 2010).

9.2    The Contractual Products shall be delivered DAP Raleigh, North Carolina/USA (Incoterms 2010) to the delivery address named by the CUSTOMER.
If the destination changes logistic costs needs to be adjusted.

## 10. Product and Performance Guarantee

The parties acknowledge that the CUSTOMER will grant the end customer a product and performance guarantee with respect to the Contract Products. To support the CUSTOMER'S warranty, the SUPPLIER shall also grant the CUSTOMER a product and performance guarantee with respect to the Contract Products in accordance with <u>Appendix 5</u>. The SUPPLIER shall indemnify the CUSTOMER from any third party claims resulting from (i) Contract Products that do not conform to the warranty provided by SULLPIER, and (ii) infringement of third-party patent or other intellectual property rights by the Contract Products.

## 11. Warranty, Cooperation in the Event of Complaints

11.1 The SUPPLIER shall inspect the delivered Pre-Products for existing defects and notify the CUSTOMER of any defects in writing or by email within three working days following receipt of such products; notification of hidden defects must be given within five working days of their discovery. Should the SUPPLIER fail to provide the CUSTOMER with the abovementioned notification, the Pre-Products are deemed to be accepted. The Pre-Products are also deemed to be accepted if the SUPPLIER commences production without the abovementioned notification of defects.

The CUSTOMER shall inspect the delivered Contractual Products for existing visible defects and notify the SUPPLIER of any visible defects in writing or by email within five working days; notification of hidden defects must be given within ten working days of their discovery. Should the CUSTOMER fail to provide the SUPPLIER with the abovementioned notification, the Contractual Products are deemed to be accepted.

11.2 The SUPPLIER shall only utilize the claim form attached hereto in Appendix 6 for notification of defects with regard to the Pre-Products. An RMA number shall be requested from the CUSTOMER for return shipments at the time of submitting the claim form. failure to utilize the proper claim form and obtain an RMA number shall entitle CUSTOMER to refuse acceptance of the Pre-Products which are the subject of the claim. Any additional costs arising as a result of this shall be borne by the SUPPLIER.

11.3 If the SUPPLIER identifies defects in the Pre-Products, but these can still be processed to produce a class B Contractual Product, the SUPPLIER shall, before returning the Pre-Products, advise the CUSTOMER in writing and mutually discuss the option of processing to produce a class B contractual product instead of return shipment.

11.4 In the event of complaints from end users of the Contract Products, the SUPPLIER shall conduct without delay all necessary or appropriate investigations, examinations and analyses and thereafter notify the CUSTOMER of the causes and the measures necessary or advisable to remedy such defects as soon as possible. Both parties shall cooperate and use their respective best efforts to detect the causes of the complaints for end users of Contract Products and in the identification/development of a solution to the problem, even if the cause of the complaints is disputed between the parties.

11.5 In the event of non-compliance with the quality standards respectively agreed upon in the module specification or in the event of any other deterioration in the quality of the Contractual Products supplied which can be identified, the CUSTOMER, in addition to any other remedies provided for herein, reserves the right to suspend in whole or in part the purchase of quantities for which a binding order has already been placed until such time as the required quality level has been re-established by the SUPPLIER, except if such non-compliance or deterioration is caused by Pre-Products or any other reasons attributable to the CUSTOMER. In such event, the SUPPLIER shall have no claim for damages or other compensation against the CUSTOMER due to such suspension.

11.6 The Customer is entitled to correct any minor defects which do not require disassembly of the Contractual Product at the Supplier's expense up to a value of 90 US$ per module plus maximum travelling expenses of 210 US$. Such defects include:
- Opening and re-closing of the connection socket cover
- Replacement of the bypass diodes

- Connector replacement (cutting off and crimping on of a new connector) in line with the assembly instructions of the connector manufacturer

The warranty rights of the CUSTOMER and claims arising from the product and performance guarantee shall remain unaffected.

11.7 The warranty period for the Contract Products shall be 10 years commencing arrival date at the CUSTOMER. In case the SUPPLIER supplies a substitute product as part of the warranty service, the warranty period for the substitute product shall be the remaining warranty period.

## 12. Quality

12.1 The Agreement on Quality, Occupational Health and Safety, Environmental Protection and Social Responsibility of the Robert Bosch GmbH (Quality Assurance Agreement) as per Appendix 9 shall apply.

12.2 In addition, each material or any assured material property used for manufacture of the Contractual Product, with the exception of the Pre-Products provided by the CUSTOMER, shall require the prior consent of the CUSTOMER. The CUSTOMER is to be notified of any changes to the material used at least three months in advance or at shorter notice following mutual agreement and the prior written consent of the Customer must be obtained; provided, however, in the event of an event of force majeure which renders agreed notice period or prior consent impossible, the SUPPLIER may make changes to the material with shorter notice period or obtain approval within a reasonable time thereafter. In such cases, the CUSTOMER is to be provided, if applicable, with specimens of the changed material and trial contractual products for test purposes or alternatively corresponding verifiable test reports are to be submitted.

## 13. Insurance

13.1 The SUPPLIER shall maintain the following liability insurances for the duration of the contractual relationship with the CUSTOMER with the following minimum insured sums:

  a. Workers' Compensation – statutory limits; Employer's Liability - limit 1 Mio USD per accident , 1 Mio USD per illness, employee, 1 Mio USD per illness, aggregate;
  b. Commercial General Liability Insurance including product and completed operations liability insurance - 4 Mio USD per occurrence , 4 Mio USD aggregate , 4 Mio USD products and completed operations;
  c. Property builders risk insurance - Replacement cost of any materials in the care, custody, and control of Bosch;
  d. With the exception of coverages shown in (a) above, CUSTOMER shall be named as an additional insured on the aforementioned policies.

13.2 Written confirmation by the insurer of the abovementioned insurance coverage is appended in Appendix 8. The SUPPLIER shall be obliged to inform the CUSTOMER immediately in writing prior to any relevant changes to the insurance relationship, in particular of the lapse of the insurance coverage.

13.3 The SUPPLIER shall remain liable to the CUSTOMER or third parties, as the case may be, for the full amount of the damage suffered by the CUSTOMER or third party notwithstanding that the SUPPLIER has failed to maintain the required insurance

coverage, or the amount of the damages or losses exceed the amount of insurance, up to a maximum of 125% of the amount of insurance coverage required to be provided by SUPPLIER pursuant to section 13.1 above coverage. The CUSTOMER reserves the right to amend the foregoing insurance requirements on any future extensions of this contract pursuant to Section 2, Duration of Contract above.

**14.   Ownership/Securities**

14.1   The CUSTOMER expressly reserves title to the Pre-Products, provided, in the event the Pre-Products are processed or reshaped by the SUPPLIER, or in the event of processing with goods which are not the property of the CUSTOMER, the CUSTOMER is automatically granted a security interest in the newly created goods, in particular with regard to the Contractual Products. The Pre-Products and Contractual Products are to be stored separately in the warehouse of the SUPPLIER and marked as being the property or co-owned property of the CUSTOMER.

**15.   Right to extraordinary termination**

15.1   In the following events, the CUSTOMER shall have the right to terminate immediately the contract by written notice:

   a. the SUPPLIER fails to obtain and maintain the insurance coverage agreed as per section 13,

   b. the SUPPLIER fails to meet his obligations repeatedly over a period of more than 4 weeks, except when caused by the non-punctual delivery of the Pre-Product by the CUSTOMER

   c. in the event the SUPPLIER becomes bankrupt or insolvent, files or is subjected to the filing for bankruptcy, or otherwise evidence financial difficulties or problems that potentially jeopardize its ability to perform it obligations under the contract.

15.2   In the following events, the SUPPLIER shall have the right to immediate termination by written notice:

   a. The CUSTOMER fails to provide the Pre-Product repeatedly or over a period of more than 4 weeks;

   b. The CUSTOMER fails to meet his payment obligations despite repeated written and punctual requests for payment.

The parties shall not be entitled to terminate the Contract prior to its expiration for any reasons not listed under section 5, 6 and 15. Claims for damages by the against the party terminating the contract for one of the above reasons shall not be permitted. In the case of termination due to causes attributable to the CUSTOMER, the SUPPLIER shall be entitled to sell any and all Contractual Products which fulfill the requirements of the product specification (appendix 3) already produced as of the date of termination at the price fixed in accordance with section 5. The foregoing is cumulative to any other remedies available to the parties under this Delivery Contract and applicable laws.

16. **Final provisions**

16.1 Changes and additions to this delivery contract (including this clause 16.1) must be made in written form and signed by duly authorized representative of both parties.

16.2 Should any provisions of this contract be or become wholly or partially ineffective, it does not affect the effectiveness of the other provisions. In such case, the parties to the contract shall agree upon an effective provision complying as closely as possible to the commercial purpose of the ineffective provision. The same applies with respect to any omission of a necessary term.

16.3 This delivery contract and all agreements governed by it as well as any disputes arising out of it shall be governed by the laws of the State of Michigan, without regard to its rules concerning conflicts of law.

16.4 The state and federal courts of seated in the State of Michigan shall have exclusive jurisdiction over contractual disputes, and both parties hereby consent and agree to be bound by the jurisdiction of such courts.

16.5 The assignment of rights or transfer of obligations arising from this contract requires the prior written consent of the other party to the contract.

17. **Special provisions**

17.1 In case of any conflicts between Appendix 1 (Terms and Conditions of Purchase) and Appendix 4 (Logistics Regulations), the terms of Appendix 4 (Logistic Regulations) shall prevail.

17.2 Force Majeure. Neither party shall be in breach of this Contract if there is any total or partial failure of performance by it of its duties and obligations under this Contract occasioned by any act of God, Act of government, war, act of terrorism and any other reasons beyond the control of either party (excluding strike or other forms of labor disputes) ("**Force Majeure**"). If either party is unable to perform its duties and obligations under this Contract as a direct result of the effect of an event of Force Majeure, that party shall give immediately written notice to the other of the inability stating the reasons. The operation of this Contract shall be suspended during the period in which the event of Force Majeure continues. If the event of Force Majeure continues for a period of more than [30] days and substantially affects the commercial basis of this Contract, either party may terminate this Contract on giving written notice to the other party. The termination of this Contract in accordance with this section 17.2 shall not give cause to either party for a claim for damages or compensation.

17.3 Confidentiality. Confidentiality obligation under Paragraph 13 of Appendix 1 (Terms and Conditions of Purchase) shall apply equally to the CUSTOMER for the benefit of the SUPPLIER.

17.4 Limitation of Liability. Except as otherwise provided for in this contract, including any of the Appendices, the SUPPLIER shall not be liable for any incidental, special, indirect or consequential damages, including, without limitation, damages for loss of profits or loss of future business opportunities.

17.5   This contract becomes effective only if the first shipment (EXW, first 40" container, app. 600 modules inside) leaves KISCO at the latest Oct. 6[th] 2011, Precondition: valid multiple listing file number placed on the module label.
Products have to fulfill product specifications (app. 3) and have to be listed according to UL 1703 by multiple listing.

**Bosch Solar Energy Corporation**

Signature: *[signature]*

Name: ERIC DANIELS

Title: ~~COFAM~~ Regional President

*[signature]* 1/19/2012
John Saussele
Director

**GETWATT, KISCO Energy Division**

Signature: *Joseph* 12/23

Name: Young Gue Lee

Title: Exec. Director

Appendices:

Appendix 1: Terms of purchase of Bosch Solar Energy AG (as at 01/2011)
Appendix 2: Specification of solar cells (data sheet + agreed cell spec. date, version)
Appendix 3: Specification of solar modules (exact version, date etc...)
Appendix 4: Logistic Regulations
Appendix 5: Product and performance guarantee of Bosch Solar Energy AG
Appendix 6: Form for processing of complaints about cells from Bosch Solar Energy AG
Appendix 7: Complaints form
Appendix 8: Insurer's confirmation
Appendix 9: Quality assurance agreement



## Terms and Conditions of Purchase

Applicable to business transactions of Bosch Solar Energy AG, its subsidiaries domiciled in Germany (affiliated companies pursuant to Section 15 AktG), in particular Bosch Solar Wafers GmbH, Bosch Solar Thin Film GmbH and Bosch Solar Operations GmbH with companies, legal entities under public law and special funds under public law. Furthermore, applicable to business transactions of Bosch Solar CISTech GmbH.

**1. General**
Our Terms and Conditions of Purchase apply exclusively; general business terms and conditions of the supplier conflicting with or deviating from our Terms and Conditions of Purchase are only recognized insofar as we expressly agreed to them in writing. Acceptance or payment of goods and services from the supplier (hereinafter referred to as Products) does not constitute agreement.

**2. Conclusion of and Modifications to the Contract**
2.1 Orders, contracts and order releases as well as modifications and supplements thereto must be placed and made in writing.
2.2 Oral agreements of any kind – including subsequent modifications and supplements to our Terms and Conditions of Purchase – must be confirmed by us in writing to become effective.
2.3 The written form requirement is also deemed complied with if communications are sent by remote data transmission or facsimile transmission.
2.4 Cost estimates are binding and are not to be compensated unless otherwise expressly agreed.
2.5 We are entitled to cancel the order if the supplier does not accept the order within two weeks of receipt thereof.
2.6 Order releases within the framework of order and order release planning become binding if the supplier does not object within two working days of receipt thereof.
2.7 The Agreement on Quality, Occupational Health and Safety, Environmental Protection and Social Responsibility for Suppliers (Quality Assurance Agreement), the Logistics Manual and the Delivery and Packaging Specifications of Robert Bosch GmbH form an integral part of the contract.

**3. Delivery**
3.1 Deliveries deviating from our contracts and orders are only admissible if given our prior written approval.
3.2 Agreed periods and dates are binding. Punctual compliance with the delivery periods and delivery dates is determined by the date of receipt of the goods by us. Unless delivery "free at factory gate (frei Werk)" agreed (DAP or DDP Incoterms 2010), the supplier shall make the goods available in good time, taking account of the time for loading and shipment to be agreed with the forwarder.
3.3 If the supplier is responsible for set-up or installation and unless otherwise agreed, the supplier shall bear all the necessary incidental costs such as travel expenses, provision of tools and daily allowances, subject to the reservation of divergent regulations.
3.4 The provisions of statute shall apply if agreed dates are not met. If the supplier anticipates difficulties with respect to production, the supply of precursor material, compliance with the delivery period or similar circumstances that could interfere with supplier's ability to deliver punctually or to deliver the agreed quality, the supplier must immediately notify our ordering department.
3.5 The unconditional acceptance of a delayed delivery or service does not constitute a waiver of claims to which we are entitled due to the delayed delivery or service; this applies pending full payment of the amounts owed by us for the delivery or service in question.
3.6 Partial deliveries are inadmissible in principle unless we expressly agreed to them or can reasonably be expected to accept them.
3.7 The values established by us during the incoming goods inspection shall determine the quantities, weights and measurements subject to the reservation of different values being proved.
3.8 We have the right to use software belonging to the scope of delivery, including the software documentation, to a legally permissible extent (§§ 69a ff. UrhG [German Copyright Act]).
3.9 We also have the right to use such software, including the software documentation, with the agreed performance characteristics and to the extent necessary for the use of the product in accordance with the agreement. We also have the right to make a backup copy even without an express agreement.

**4. Force Majeure**
4.1 Acts of God, operational disturbances without fault, unrest, governmental measures and other unavoidable events discharge us from our obligation to take punctual delivery for the duration of such event. During such events and for a two week period thereafter we are entitled – notwithstanding our other rights – to withdraw from the contract in whole or in part, provided that such events are not of inconsiderable duration and our requirements are considerably reduced as the goods have to be procured elsewhere as a result thereof.
4.2 The provisions of paragraph 4.1 above also apply in the case of labor disputes.

**5. Advice of Dispatch and Invoice**
The details in our orders and order releases shall apply. An invoice showing the invoice number and other allocation references is to be sent in one copy to the respective printed mailing address; the invoice must not be enclosed with the shipments.

**6. Pricing and Passing of Risk**
Unless otherwise agreed, the prices are "Delivered at Place" (DAP Incoterms 2010) including packaging. Value added tax (VAT) is not included. The supplier bears all risks of loss or of damage to the goods until the goods are received by us or by our representative at the location to which the goods are to be delivered in accordance with the contract.

**7. Payment Terms**
Unless otherwise agreed, the invoice shall be paid either within 20 days subject to deduction of a 3 % discount or within 30 days without any deduction, with effect from the due date of payment and receipt of both the invoice and the goods or performance of the service. Payment is subject to invoice verification.

**8. Claims Based on Defects**
8.1 Acceptance is effected subject to the reservation of an examination for faultlessness, in particular also including accuracy and completeness, insofar and as soon as this is pertinent in the ordinary course of business. We will give notice of any defects found without undue delay after their discovery. To this extent the supplier waives the objection to delayed notification of defects.
8.2 The provisions of statute relating to defects as to quality and defects of title apply except insofar as otherwise provided hereinbelow.
8.3 In principle we have the right to select the type of supplementary performance. The supplier may refuse the type of supplementary performance we selected if it is only possible at disproportionate expense.
8.4 In the event that the supplier does not commence rectifying the defect immediately after our request to remedy it, in urgent cases, especially to ward off acute danger or to prevent greater damage, we are entitled to undertake such rectification ourselves or to have it undertaken by a third party at the expense of the supplier.
8.5 In case of defects of title, the supplier shall also hold us harmless from any third party claims possibly existing, unless the supplier is not accountable for the defect of title.
8.6 The limitation period for claims based on defects is 3 years – except in cases of fraudulent misrepresentation – unless the thing has been used in a building construction in accordance with its customary use and caused the defectiveness thereof. The limitation period commences when the Product is delivered (passing of risk).
8.7 If the supplier performs its obligation to effect supplementary performance by supplying a substitute product, the statute of limitations of the goods delivered in substitution shall start to run anew after delivery thereof unless, when effecting the supplementary performance, the supplier explicitly and appropriately made the reservation that the substitute delivery was effected purely as good will, to avoid disputes or in the interests of continuation of the delivery relationship.
8.8 Should we incur expenses as a result of the defective delivery of the Product, in particular transport, carriage, labor costs, assembly and disassembly costs, costs of material or costs of incoming goods control exceeding the normal scope of the control, such costs shall be borne by the supplier.

**9. Product Liability and Recall**
9.1 In the event a product liability claim is asserted against us, the supplier is obliged to hold us harmless from such claims if and to the extent the damage was caused by a defect in the Product supplied by the supplier. In cases of liability based on fault, this only applies, however, if the supplier is at fault. Insofar as the cause of the damage falls within the area of

responsibility of the supplier, the supplier must prove that it is not at fault.

9.2 In the cases of paragraph 9.1 above, the supplier assumes all costs and expenses, including the costs of any legal action.

9.3 In all other respects the provisions of statute shall apply.

9.4 Prior to any recall action which is partially or wholly due to a defect in a Product supplied by the supplier, we shall notify the supplier, give the supplier the opportunity to collaborate and discuss with the supplier the efficient conduct of the recall action, unless no notification of or collaboration by the supplier is possible on account of the particular urgency. The costs of the recall action shall be borne by the supplier insofar as a recall action is due to a defect in a Product supplied by the supplier.

**10. Rights of Withdrawal and Termination**

10.1 In addition to the statutory rights of rescission we have the right to withdraw from or terminate the contract with immediate effect if
– the supplier has stopped supplying its customers,
– there is or threatens to be a fundamental deterioration to the financial circumstances of the supplier and as a result of this the performance of a supply obligation to us is in jeopardy,
– the supplier meets the criteria for insolvency or over-indebtedness, or
– the supplier stops making its payments.

10.2 We also have the right to withdraw from or terminate the contract if the supplier files an application for insolvency or comparable debt settlement proceedings to be initiated with respect to its assets.

10.3 If the supplier rendered part performance, we only have the right to cancel the whole contract if we have no interest in the part performance.

10.4 If we withdraw from or terminate the contract by virtue of the foregoing contractual rescission rights or respective termination rights, then the supplier must compensate us for the loss or damage incurred as a result, unless the supplier was not responsible for the rights arising to withdraw from or terminate the contract.

10.5 Statutory rights and claims shall not be limited by the regulations included in this Section 10.

**11. Conducting Work**
Persons who carry out work on our factory premises in fulfillment of the contract must observe the respective plant regulations. The liability for accidents suffered by these persons on our factory premises is excluded except to the extent caused by willful or gross negligent breach of duty by our legal representatives or persons employed in the performance of our obligations.

**12. Provision of Materials**
Materials, parts, containers and special packaging provided by us remain our property. These may only be used as designated. The materials are processed and parts assembled for us. It is agreed that we are co-owner of the products manufactured with our materials and parts in proportion to the value of the materials or parts provided in relation to the value of the whole product; such products shall be kept safe for us by the supplier to this extent.

**13. Documentation and Confidentiality**

13.1 The supplier shall keep confidential with respect to third parties all business and technical information made available by us (including features which may be derived from objects, documents or software provided and any other knowledge or experience) as long and to the extent that it is not proven public knowledge, and it may only be made available to those persons in the supplier's business facility who necessarily need to be involved in the use thereof for the purpose of delivery to us and who are also committed to confidentiality; the information remains our exclusive property. Without our prior written consent, such information must not be duplicated or exploited commercially – except for deliveries to us. At our request, all information originating from us (if appropriate also including any copies or records made) and loaned items must be, without undue delay, returned to us in full or destroyed.
We reserve all rights to such information (including copyright and the right to file for industrial property rights such as patents, utility models, semiconductor protection, etc.). In the event this is provided to us by third parties, the reservation of rights also applies for the benefit of such third parties.

13.2 Products manufactured on the basis of documentation drafted by us such as drawings, models and the like, or based on our confidential information, or manufactured with our tools or with tools modeled on our tools, may neither be used by the supplier itself nor offered or supplied to third parties. This also applies analogously to our print orders.

**14. Export Control and Customs**
The supplier shall be obliged to inform us about any applicable (re-) export licence requirements for the Products under German, European or US export control law and customs regulations as well as the export control law and customs regulations of the country of origin of the Products. Therefore, at least in his offers, order confirmations and invoices the supplier shall provide the following information with respect to the Products:
- export list number (*Ausfuhrlistennummer*) pursuant to Annex AL to the German Foreign Trade and Payments Regulation (*Außenwirtschaftsverordnung*) or any comparable export list information of applicable export lists;
- ECCN (*Export Control Classification Number*) for US-goods (including technology and software) pursuant to the US Export Administration Regulations (*EAR*);
- country of origin of the Products and of the components thereof, including technology and software;
- any transport of the Products through USA, manufacture or stocking of the Products in the USA and whether the Products have been manufactured by using US technology;
- HS-Code of the Products; and
- a contact person in his organisation to provide further information to us upon request.

Upon our request the supplier shall provide any other foreign trade data with respect to the Products and their components in written form and shall inform us on all changes to such data without undue delay and prior to supply to us.

**15. Compliance**

15.1 The supplier shall comply with the respective statutory provisions governing the treatment of employees, environmental protection and health and safety at work and to work on reducing the adverse effects of its activities on human beings and the environment. In this respect the supplier shall set up and further develop a management system in accordance with ISO 14001 within the realms of its possibilities. Further, the supplier shall comply with the principles of the UN Global Compact Initiative relating basically to the protection of international human rights, the right to collective bargaining, the abolition of forced labor and child labor, the elimination of discrimination when personnel is engaged and employed, the responsibility for the environment and the prevention of corruption. Further information on the UN Global Compact Initiative is available at: www.unglobalcompact.org.

15.2 In the event that a supplier repeatedly violates the law and/or violates the law despite being given respective advice, and fails evidence that the violation of the law has been cured as far as possible and that appropriate precautions have been taken to avoid violations of the law in future, we reserve the right to terminate or withdraw from existing contracts without notice.

**16. Place of Performance**
The place of performance is the place to which the goods are to be delivered in accordance with the contract or where the service is to be rendered.

**17. Miscellaneous**

17.1 If one of the provisions of these Terms and Conditions and of additional agreements reached should be or become ineffective, this shall not affect the validity of the Terms and Conditions in other respects. The parties hereto are obliged to agree upon a provision to replace the ineffective provision that approximates as closely as possible the economic intent of the ineffective provision.

17.2 The contractual relationships shall be governed exclusively by German law excluding the conflict of law provisions and the UN Convention on Contracts for the International Sale of Goods (CISG).

17.3 The venue for all legal disputes arising either directly or indirectly out of contractual relationships based on these Terms and Conditions of Purchase shall be the place of business of the respective Bosch-Company. We further have the right to take legal action against the supplier at a court with jurisdiction over the registered office or branch office of the supplier or at the court with jurisdiction over the place of performance at our discretion.

17.4 If suppliers' place of business is located outside Germany, as an alternative to submitting a dispute to the ordinary court (staatliches Gericht) we further have the right to take legal actions against the supplier regarding all legal disputes arising either directly or indirectly out of contractual relationships at a Court of Arbitration with its place in Erfurt. The Court of Arbitration shall consist of three (3) arbitrators. The chairman of the Court of Arbitration shall be a fully qualified lawyer. The Court of Arbitration shall act on the basis of the Rules of Arbitration (Edition 1998) of the International Chamber of Commerce, Paris.